# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MD Helicopters Incorporated, | No. CV-17-02598-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Boeing Company, | |
| Defendant. | |

At issue is Plaintiff/Counter-Defendant MD Helicopters Inc.'s ("MDHI") Motion for Summary Judgment (Doc. 146) and Defendant/Counter-Claimant the Boeing Company's ("Boeing") Motion for Partial Summary Judgment on MDHI's *Force Majeure* Defense (Doc. 123). The Court now rules on these Motions.

## I. FACTUAL BACKGROUND

MDHI manufactures helicopters for commercial, military, and law enforcement markets. (Doc. 9 at 2 ¶ 7).[1] Boeing is an aerospace business that, among other product offerings, designs, develops, produces, sells, and offers support for military helicopters. (Docs. 9 at 3 ¶ 9; 16 at 2 ¶ 9). In July 2010, MDHI and Boeing entered into a Memorandum of Agreement ("2010 MOA"), (Doc. 138-3 at 41–67), providing that "MDHI and Boeing will cooperatively produce and support the AH-6i Aircraft in the worldwide market[,]" (*id* at 43). On October 6, 2011, MDHI and Boeing signed a Long Term Requirements

---

[1] The page numbers referenced throughout this Order are those assigned by PACER in the imprinted ECF header, which are listed on the top of each page of each document.

Contract ("LTRC"), (Doc. 127-1 at 8–53), whereby MDHI agreed to build and sell, and Boeing agreed to buy, airframes and related components for use in the manufacture of Boeing's AH-6i helicopters, (*id.* at 10). (*See also* Docs. 138 at 3–4 ¶ 1; 147 at 2 ¶ 1). The LTRC incorporated the Boeing Company General Provisions 1 ("GP1"), (Docs. 127-1 at 43–51), which sets forth various terms governing the parties' relationship over the course of the AH-6i program. (*See id.* at 24–25 (stating that GP1 is "attached hereto and incorporated by reference" into the LTRC)).

On July 26, 2012, Boeing placed a purchase order for 24 airframes and related components for the AH-6i from MDHI by issuing Purchase Contract No. 648538 ("Purchase Contract") pursuant to the LTRC. (Doc. 127-1 at 55–82). MDHI signed this Purchase Contract in September 2012. (Docs. 16 at 15 ¶ 40; 29 at 5 ¶ 40; 57 at 7 ¶ 40). Under the Purchase Contract, the airframes and related components were to be delivered to Boeing on a rolling basis pursuant to a schedule set forth therein. (Docs. 127-1 at 56; 147 at 2 ¶¶ 2–3). The Purchase Contract and the LTRC provided that Boeing would make performance-based payments and delivery payments to MDHI after MDHI met certain production milestones. (Doc. 127-1 at 42, 81). Specifically, MDHI would receive a 15% payment after long-lead material orders were placed, 25% upon the loading of the airframe on the production line, 30% upon receipt of the airframe from MDHI's Monterrey, Mexico facility, and the final 30% upon delivery of the airframe to Boeing. (*Id.*). The Purchase Contract was also subject to the provisions set forth in the GP1, which the LTRC incorporated. (*See id.* at 43–51).

Although the Purchase Contract obligated MDHI to deliver all 24 airframes by December 11, 2014, (*id.* at 56), MDHI did not deliver the first airframe until June 25, 2015, (Docs. 127-10 at 68; 147 at 13). Thereafter, on August 14, 2015, MDHI and Boeing entered into a Memorandum of Agreement ("2015 MOA"), (Doc. 127-1 at 84–88), to resolve the parties' disputes regarding the scope of work, pricing, and delivery schedule for the AH-6i airframes that had arisen under the LTRC and the Purchase Contract. (Docs. 127-1 at 84; 138 at 4–5 ¶¶ 4–5; 147 at 3 ¶¶ 4–5). The 2015 MOA established a revised delivery schedule

and new purchase price for each airframe, while retaining the performance-based milestones. (Doc. 127-1 at 84–85). The 2015 MOA also specified that the parties "agree that the Boeing Company General Provisions currently detailed on the Purchase Order will continue to apply according to the Purchase Order." (*Id.* at 85).

On March 7, 2016, the parties agreed to Purchase Contract Change 32 ("PCC-32"), which again modified the delivery schedule for Airframes 8 through 24. (Doc. 125-1 at 1–34; *see also* Docs. 125 at 1; 136 at 1). PCC-32 incorporates GP1 by reference. (Docs. 125-1 at 29; 125 at 2; 136 at 2). MDHI did not deliver Airframes 8 through 24 by the deadlines established in PCC-32. (Docs. 125 at 4; 125-1 at 37; 136 at 2). The following table shows the delivery deadlines to which the parties agreed in PCC-32, the actual dates on which MDHI delivered the airframes, and the delivery delay for each airframe:

| Airframe | Contract Date | Actual Delivery Date | Days Late |
|----------|---------------|----------------------|-----------|
| **8** | April 29, 2016 | June 27, 2016 | 59 |
| **9** | May 19, 2016 | September 14, 2016 | 118 |
| **10** | June 3, 2016 | October 6, 2016 | 125 |
| **11** | June 17, 2016 | October 20, 2016 | 125 |
| **12** | July 1, 2016 | October 27, 2016 | 118 |
| **13** | July 18, 2016 | December 8, 2016 | 143 |
| **14** | August 1, 2016 | January 9, 2017 | 161 |
| **15** | August 15, 2016 | January 24, 2017 | 162 |
| **16** | August 29, 2016 | January 24, 2017 | 148 |
| **17** | September 13, 2016 | March 21, 2017 | 189 |
| **18** | September 27, 2016 | March 21, 2017 | 175 |
| **19** | October 11, 2016 | March 21, 2017 | 161 |
| **20** | October 25, 2016 | March 27, 2017 | 153 |
| **21** | November 8, 2016 | April 18, 2017 | 161 |
| **22** | November 22, 2016 | May 2, 2017 | 161 |

| | | | |
|---|---|---|---|
| **23** | December 7, 2016 | May 18, 2017 | 162 |
| **24** | December 21, 2016 | June 28, 2017 (short shipped) | 189 |

(*Id.*).

On June 28, 2017, MDHI delivered Airframe 24 to Boeing without certain components, (Docs. 125 at 5; 136 at 3), as authorized by an agreement regarding the short shipment dated that same day, (Doc. 125-1 at 76–77). This June 28, 2017 agreement further required MDHI to install those missing components at Boeing's facility when they became available, (*id.* at 77), but MDHI never did so, (Docs. 125 at 5; 136 at 3). MDHI claims that it was "relieved from any obligation to install the 'short' parts on Airframe 24 when Boeing failed to pay the monies it owed under the terms of the contract." (Doc. 136 at 3). As a result of MDHI's refusal to install the missing components on Airframe 24, Boeing contends it was "required to purchase and retrofit the requisite parts itself to complete Aircraft 24, requiring Boeing to extend the AH-6i program beyond its anticipated end date." (Doc. 125 at 6).

MDHI alleges that it has since produced and delivered all 24 airframes to Boeing, but Boeing has "failed and refused to make performance-based payments for line-loading airframes 14, 23, and 24; has failed and refused to make final delivery payments for airframes 14, 22, 23, and 24; and has failed and refused to pay MDHI's invoice for Pressure Switches that MDHI supplied at Boeing's request." (Doc. 147 at 3–4 ¶ 7). In total, MDHI claims that Boeing owes $3,808,775.00 for these invoices, (*id.* at 4 ¶ 8), which are set forth below:

| Date | Invoice # | Event | Amount Due |
|---|---|---|---|
| 3/30/17 | 194375 | Item 71 – PSR Switch | $18,275.00 |
| 4/26/17 | 7926715 | Delivery of Airframe 22 | $541,500.00 |
| 4/27/17 | 8019451 | Line-loading Airframe 14 | $541,500.00 |
| 4/27/17 | 8019453 | Line-loading Airframe 23 | $541,500.00 |

| 5/23/17 | 7953638 | Delivery of Airframe 23 | $541,500.00 |
|---------|---------|-------------------------|-------------|
| 5/31/17 | 7988197 | Delivery of Airframe 14 | $541,500.00 |
| 6/20/17 | 8066389 | Line-loading Airframe 24 | $541,500.00 |
| 6/28/17 | 8070519 | Delivery of Airframe 24 | $541,500.00 |
| **Total Invoice Amount Due** | **$3,808,775.00** | | |

While Boeing "admits that it is in possession of the AH-6i airframes MDHI delivered," Boeing states that these invoices are not due and payable because MDHI's delivery of Airframe 24 was incomplete and nonconforming. (Docs. 16 at 4 ¶ 29; 138 at 5 ¶ 7). Boeing claims that it only accepted delivery of Airframe 24 "upon MDHI's promise to complete the installation of those missing components at Boeing's facility when they became available," but MDHI never did so. (Doc. 138 at 5 ¶ 6). Boeing further contends that it has incurred costs resulting from MDHI's delayed and defective airframes which are substantially greater than the payments MDHI claims are owed and which are recoverable from MDHI as either an "equitable price reduction" or "credit against any amounts that may be owed." (*Id.* at 5 ¶ 7).

Using the 24 airframes and kits which MDHI had built, in addition to other kits and systems built by Boeing and other suppliers, Boeing ultimately assembled the 24 Ah-6i helicopters. (Docs. 138 at 6 ¶ 9; 147 at 5 ¶ 9). Boeing sold these 24 helicopters for $234,700,000.00 to the U.S. Government who, in turn, sold them to the Saudi Arabian National Guard ("SANG"). (Docs. 138 at 6 ¶¶ 9–10; 147 at 5 ¶¶ 9–10).[2] The U.S. Government did not assess any monetary penalty on Boeing for the late delivery of these helicopters. (Doc. 128-5 at 375–76, Woody Dep. 19: 3–24, 22: 11–21).

---

[2] The transaction between Boeing, the U.S. Government, and the SANG was a Foreign Military Sale, whereby Boeing sold AH-6i helicopters to the U.S. Government who, in turn, sold those military products to the SANG. (Docs. 16 at 18 n.5; 128-4 at 603, Lambertson Dep. 61: 13–62: 2 ("Boeing has what's called a prime contract directly with the U.S. Government, and the U.S. Government has a contract with the Saudi Government. It's called a foreign military sale.")).

## II.    PROCEDURAL BACKGROUND

On August 3, 2017, MDHI filed suit against Boeing, (Doc. 1), and thereafter filed an Amended Complaint on September 11, 2017, (Doc. 9). MDHI seeks damages for breach of contract in an amount not less than the amount of its outstanding invoices, alleging that Boeing's refusal and failure to pay the invoices MDHI issued constitutes a material breach of the parties' contract for the sale of AH-6i airframes and the terms of the 2015 MOA. (Doc. 9 at 6–7 ¶¶ 31–38).[3] In the alternative, should any required provision of the parties' agreement be ambiguous or undefined, MDHI seeks damages for breach of the implied covenant of good faith and fair dealing. (*Id.* at 8 ¶ 45).

On October 3, 2017, Boeing filed an Answer denying that MDHI is entitled to judgment in its favor or to any of the relief it has demanded. (Doc. 16 at 5 ¶ 50). That same day, Boeing also asserted nine counterclaims against MDHI, including: (1) Breach of the Asset Acquisition Agreement ("AAA"); (2) Breach of the Cross License; (3) Breach of the LTRC; (4) Breach of the GP1; (5) Breach of the 2015 MOA and PCC-32; (6) Breach of the Implied Covenant of Good Faith and Fair Dealing; (7) Conversion; (8) Tortious Interference with Contract and Business Expectancy; and (9) Declaratory Judgment. (*Id.* at 29–36 ¶¶ 121–65). On October 24, 2017, MDHI moved to dismiss all of Boeing's counterclaims except its Fifth Counterclaim. (*See* Doc. 21). In its April 23, 2018 Order ruling on MDHI's Motion to Dismiss Boeing's Counterclaims 1–4 and 6–9 (Doc. 21), the Court dismissed without prejudice Boeing's First and Second Counterclaims, and dismissed with prejudice Boeing's Fourth Counterclaim. (Doc. 50 at 17). However, the Court did not dismiss Boeing's Third, Sixth, Seventh, Eighth, or Ninth Counterclaims, (*id.*), and Boeing's Fifth Counterclaim also remains.[4] MDHI filed an Answer and Defenses

---

[3] MDHI also seeks prejudgment interest, costs, and attorneys' fees. (Docs. 9 at 9; 146 at 2).

[4] The Court's April 23, 2018 Order dismissed Boeing's first allegation under its Third Counterclaim—specifically, that MDHI materially breached its contractual obligation under the LTRC "not to undertake any action or communicate any information to maliciously or unfairly influence Boeing's efforts to sell and support its AH-6i." (Doc. 50 at 11 (citing Doc. 13 at 31)). In that same Order ruling on MDHI's Motion to Dismiss, the Court determined that while Boeing's Sixth Counterclaim failed with regard to the AAA, Cross License, LTRC, and GP1, it survived with regard to the 2015

to Boeing's Counterclaims. (Docs. 29; 57).

On February 28, 2019, Boeing filed a Motion for Partial Summary Judgment on MDHI's *Force Majeure* Defense (Doc. 123) and a supporting Statement of Facts (Doc. 125). Thereafter, MDHI filed its Response to Boeing's Motion (Doc. 135) and corresponding Controverting Statement of Facts and Statement of Additional Facts (Doc. 136) on April 1, 2019. On April 16, 2019, Boeing filed a Reply in Support of Its Motion for Partial Summary Judgment (Doc. 141).

On February 28, 2019, MDHI filed redacted versions of a Motion for Summary Judgment (Doc. 126) and accompanying Separate Statement of Material Undisputed Facts in Support of its Motion for Summary Judgment (Doc. 127).[5] In compliance with the Court's May 21, 2019 Order, Plaintiff filed updated versions of its Motion for Summary Judgment (Doc. 146) and supporting Statement of Facts (Doc. 147) on May 28, 2019. The Court deemed the later filed versions of MDHI's Motion (Doc. 146) and Statement of Facts (Doc. 147) timely, and struck the earlier versions filed at Doc. 126 and Doc. 127. (Doc. 145 at 7). Although the Court struck the redacted version of MDHI's Separate Statement of Material Undisputed Facts in Support of Its Motion for Summary Judgment (Doc. 127), the Court did not strike the exhibits filed therewith at Doc. 127-1–127-10. Further, for purposes of resolving the parties' Motions, the Court will consider the versions of MDHI's MOA. (*Id.* at 14).

---

[5] On February 28, 2019, the parties also jointly filed an Application for Leave to File Under Seal (Doc. 129) asking that the Court seal MDHI's unredacted Motion for Summary Judgment (Doc. 131), unredacted Statement of Facts (Doc. 132), and Exhibits 33, 35, 40, 41, 42, 45, 47, 50, 52, 53, 57, 60, 64, 70, 71, and 74 to MDHI's Motion (Docs 132-1–132-16). (Doc. 129 at 1–2). In a Joint Memorandum filed on May 10, 2019, the parties withdrew their Joint Application for Leave to File Under Seal and instead requested that portions of Exhibits 33, 35, 41, 42, 50, 57, 60, 70 and 71 be redacted. (Doc. 144 at 3–5). In this Joint Memorandum, the parties also withdrew their request to file Exhibits 40, 45, 47, 52, 53, 64, and 74 under seal, and did not propose any redactions to those exhibits. (*Id.* at 5). In an Order dated May 21, 2019, the Court stated that it would "not consider the documents lodged at Doc. 131 and Doc. 132 in the resolution of this case[,]" and would, instead, "consider the versions of Exhibits 35, 40, 41, 42, 45, 47, 50, 52, 53, 60, 64, 70, 71, and 74 filed at Docs. 144-1 and 144-2, and the versions of Exhibits 33 and 57 filed at Docs. 127-8, 127-9, and 128-2." (Doc. 145 at 7). In that Order, the Court also directed MDHI to refile public versions of its Motion for Summary Judgment (Doc. 126) and Statement of Facts (Doc. 127) which only redact the information set forth in the redacted portions of Exhibits 33, 35, 41, 42, 50, 57, 60, 70, and 71. (Doc. 145 at 7).

"Exhibits 35, 40, 41, 42, 45, 47, 50, 52, 53, 60, 64, 70, 71, and 74 filed at Docs. 144-1 and 144-2, and the versions of Exhibits 33 and 57 filed at Docs. 127-8, 127-9, and 128-2." (Doc. 145 at 7).

On April 1, 2019, Boeing filed a timely Response to MDHI's Motion for Summary Judgment (Doc. 137) and Controverting Statement of Facts in Support of its Response (Doc. 138).[6] For purposes of resolving the parties' Motions, the Court will consider the versions of Exhibits C, T, Y and Z to Boeing's Controverting Statement of Facts filed at Doc. 144-3. (Doc. 145 at 7). On April 16, 2019, MDHI filed its Reply in Support of its Motion for Summary Judgment (Doc. 142). The Court heard oral argument on the parties' Motions on July 24, 2019. (Doc. 149).

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id*. 56(c)(1)(A-B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

---

[6] On April 1, 2019, Boeing also filed a Motion to Seal (Doc. 139) asking that the Court seal Exhibits C, T, Y, and Z to Boeing's Controverting Statement of Facts, and lodged those Exhibits under seal at Doc. 140. In a later filed Memorandum, Boeing withdrew its Motion to Seal (Doc. 139), and instead requested that portions of Exhibits C and T be redacted. (Doc. 144 at 1–3). In this Memorandum, Boeing also withdrew its request to file Exhibits Y and Z under seal and did not propose any redactions to those two exhibits. (*Id*. at 3). In an Order dated May 21, 2019, the Court clarified that it would not consider the documents lodged at Doc. 140 in the resolution of this case, but would, instead, consider the versions of Exhibits C, T, Y and Z to Boeing's Controverting Statement of Facts filed at Doc. 144-3. (Doc. 145 at 7).

477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and the elements of the cause of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. A material fact is any factual issue that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id*. at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial. There is no issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249-50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. (citations omitted).

## III. BOEING'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON MDHI'S FORCE MAJEURE DEFENSE

A *force majeure* clause is "[a] contractual provision allocating the risk of loss if performance becomes impossible or impracticable, especially as a result of an event or effect that the parties could not have anticipated or controlled." *Force-Majeure Clause*, *Black's Law Dictionary* (11th ed. 2019). Article 13 of GP1 is a *force majeure* clause, which states:

> FORCE MAJEURE. *Seller shall not be liable for excess reprocurement costs pursuant to the "Cancellation for Default" article of this contract*, incurred by Buyer because of any failure to perform this contract under its terms if the failure arises from causes beyond the control and without the fault or negligence of Seller. Examples of these causes are (a) acts of God or of the public enemy, (b) acts of the Government in either its sovereign or contractual capacity, (c) fires, (d) floods, (e) epidemics, (f) quarantine restrictions, (g) strikes, (h) freight embargoes and (i) unusually severe weather. In each instance, the failure to perform must be beyond the control and without the fault or negligence of Seller. If the delay is caused by delay of a subcontractor of Seller and if such delay arises out of causes beyond the reasonable control of both, and if such delay is without the fault or negligence of either, Seller shall not be liable for excess costs unless the goods or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit Seller to meet the required delivery schedules. Seller shall notify Buyer in writing within 10 days after the beginning of any such cause.

(Doc. 125-1 at 69 (emphasis added)).

Boeing moves for partial summary judgment on MDHI's *force majeure* defense to Boeing's counterclaims, stating that "the Court can easily rule, based on the language of the contract and the undisputed facts, that MDHI has no *force majeure* excuse for its delayed performance." (Doc. 123 at 1). Boeing claims that Article 13's *force majeure* clause does not apply because Boeing is not seeking excess reprocurement costs after a cancellation of default. (*Id.* at 8). Notably, MDHI does not dispute that the *force majeure* clause is inapplicable. (*See* Doc. 135 at 2 ("Boeing admittedly did not cancel the contract for default, and thus neither Article 15—nor Article 13—are at issue here. Boeing also concedes . . . that it is not seeking any excess reprocurement costs in this case. Article 13 is therefore irrelevant."), 4 ("In sum, Boeing filed a meaningless motion asking the Court to enter a ruling on a provision of Boeing's GP1 (Article 13) that is not at issue in this

case.")).[7]

Despite the parties' agreement that the *force majeure* clause of GP1 does not apply, MDHI asks that the Court deny Boeing's Motion for Partial Summary Judgment because MDHI has "never invoked" the *force majeure* clause "in connection with its claims or defenses in this case." (*Id.* at 1). Nevertheless, MDHI's denial that it ever invoked the *force majeure* clause proves disingenuous given that MDHI has explicitly asserted a *force majeure* defense on multiple occasions in this litigation, including: (1) in its position statement in the Joint Proposed Case Management Plan filed on November 3, 2017, (Doc. 24 at 3); (2) in its Answer and Defenses to Boeing's Counterclaims filed on November 27, 2017, (Doc. 29 at 15 ("The counterclaims are barred, in whole or in part, under the doctrine of force majeure.")); (3) in its Responses to Boeing's First Set of Interrogatories dated April 18, 2018, (Doc. 141-1 at 38); (4) in its Second Supplemental Response to the Court-Ordered Mandatory Initial Discovery dated May 8, 2018, (*id.* at 16, 18, 21–22); and (5) in its Supplemental Responses to Boeing's First Set of Interrogatories dated July 10, 2018, (*id.* at 58). Although MDHI did not set forth the defense of *force majeure* in the Answer to Boeing's remaining Counterclaims which it filed on May 7, 2018 after the Court ruled on MDHI's Motion to Dismiss, (Doc. 57 at 17–18), MDHI continued to assert a *force majeure* defense on two occasions thereafter. (*See* Doc. 141-1 at 16, 18, 21–22, 58 (setting forth a *force majeure* defense in its Second Supplemental Response to the Court-Ordered Mandatory Initial Discovery dated May 8, 2018 and in its Supplemental Responses to Boeing's First Set of Interrogatories dated July 10, 2018)).

Given that MDHI has repeatedly raised *force majeure*, the Court agrees with Boeing that "MDHI cannot credibly claim that Boeing is 'wast[ing] the Court's and parties' time' by seeking summary judgment on that defense." (Doc. 141 at 3 (quoting Doc. 135 at 1)). Indeed, it is MDHI who has unnecessarily and unreasonably wasted the Court's time by inaccurately representing its actions in this litigation, and by presenting arguments

---

[7] Given that the parties agree that the *force majeure* clause of Article 13 in GP1 is inapplicable to this case, the Court need not consider Boeing's remaining arguments regarding the applicability of the defense.

irrelevant to Boeing's Motion rather than forthrightly abandoning the defense in its Response after admitting that the *force majeure* clause of Article 13 is not at issue.[8] However, at oral argument MDHI conceded that it is appropriate for the Court to grant Boeing's Motion for Partial Summary Judgment.[9] Therefore, the Court will treat this concession, in conjunction with MDHI's failure to assert the affirmative defense of *force majeure* in its later-filed Answer to Boeing's remaining Counterclaims, (*see* Doc. 57), and its assertions in its Response to Boeing's Motion for Partial Summary Judgment that Article 13 is inapplicable, (*see* Doc. 135), as a withdrawal or waiver of that defense.[10] Accordingly, Boeing's Motion for Partial Summary Judgment is granted to the extent that MDHI will not be permitted to assert Article 13's *force majeure* excuse in connection with its claims or defenses in this case.

## IV. MDHI'S MOTION FOR SUMMARY JUDGMENT

MDHI asks that the Court grant summary judgment in favor of MDHI on all claims and remaining counterclaims, specifically MDHI's Breach of Contract claim (or, in the alternative, its Breach of the Implied Covenant of Good Faith and Fair Dealing claim), and Boeing's Third, Fifth, Sixth, Seventh, Eighth and Ninth Counterclaims. (Doc. 146 at 3). In opposition, Boeing asks that the Court deny MDHI's Motion for Summary Judgment in its

---

[8] MDHI spent the majority of its Response discussing how Article 2 of GP1 "excuses MDHI from strict compliance with delivery schedules in the event of 'delays attributed to labor disputes.'" (Doc. 135 at 2 (quoting Doc. 124-1 at 67)). Nonetheless, as MDHI observes, Boeing "did not seek a ruling from the Court that Article 2(a) is inapplicable." (*Id.*). Thus, the Court will not analyze MDHI's arguments regarding Article 2, as they are irrelevant to Boeing's Motion.

[9] Although MDHI conceded that summary judgment is appropriate on Boeing's Motion, MDHI stated that it wished to reserve its arguments related to Article 2 of GP1 and thus asked that the Court grant Boeing's Motion only as it relates to the *force majeure* clause of Article 13 of GP1.

[10] *See Kontrick v. Ryan*, 540 U.S. 443, 459 (2004) ("Ordinarily, . . . under the Civil Rules [of Procedure], a defense is lost if it is not included in the answer or amended answer."); *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) ("Under the Federal Rules of Civil Procedure, a party, with limited exceptions, is required to raise every defense in its first responsive pleading, and defenses not so raised are deemed waived.") (citing Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]"); Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required."); Fed. R. Civ. P. 12(g)).

entirety. (Doc. 137 at 2). The Court now considers each of the parties' claims, and all related arguments, in turn.

## A.    Breach of Contract Claims

"To establish a breach of contract, a [claimant] must prove by a preponderance of the evidence (i) 'the existence of the contract,' (ii) 'breach of an obligation imposed by that contract,' and (iii) 'resultant damage to the [claimant].'" *Air Prod. & Chems., Inc. v. Wiesemann*, 237 F. Supp. 3d 192, 213 (D. Del. 2017) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).[11] "[I]n order to recover damages for any breach of contract, [the claimant] must demonstrate substantial compliance with all the provisions of his contract." *Emmett S. Hickman Co. v. Emilio Capaldi Developer, Inc.*, 251 A.2d 571, 573 (Del. Super. Ct. 1969) (citing *Carroll v. Cohen*, 91 A. 1001, 1003 (Del. Super. Ct. 1914)); *see also Frunzi v. Paoli Servs., Inc.*, C.A. No. N11A-08-001 MMJ, 2012 WL 2691164, at *7 (Del. Super. Ct. July 6, 2012) ("It is established Delaware law that in order to recover damages for a breach of contract, the plaintiff must demonstrate substantial compliance with all of the provisions of the contract.").

"A breach of contract may be caused by nonperformance, repudiation, or both." *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, C.A. No. 5886-VCP, 2013 WL 3934992, at *10 (Del. Ch. July 24, 2013) (citing Restatement (Second) of Contracts § 236 (1981)). "[A] slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract." *E. Elec. & Heating, Inc. v. Pike Creek Prof'l Ctr.*, No. 85C-MR-79, 1987 WL 9610, at *4 (Del. Super. Ct. Apr. 7, 1987), *aff'd*, 540 A.2d 1088 (Del. 1988) (citing 11 *Williston on Contracts* § 1292, at 8 (3d ed. 1968)). Stated differently, "[n]on-performance by the injured party under such circumstances will operate as a breach of contract" by the injured

---

[11] The 2015 MOA provides that it "shall be governed by the laws of the State of Delaware[,]" (Doc. 127-1 at 86), as does the GP1, (*id.* at 49). Further, the LTRC states that the "Parties agree that Delaware law will govern Orders issued under this Agreement," and that the LTRC "shall be interpreted and the rights and obligations of the Parties shall be determined in accordance with the laws of the State of Delaware without reference to that state's conflicts of laws." (*Id.* at 19–20). Accordingly, the Court will apply Delaware law in resolving any claims arising out of these contracts.

party. *Id.* A breach is of sufficient importance to justify non-performance by the non-breaching party where the breaching party fails "to do something that is so fundamental to a contract that the failure to perform that obligation defeats the *essential purpose* of the contract or makes it impossible for the other party to perform under the contract." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471-VCP, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013) (citing *E. Elec. & Heating, Inc.*, 1987 WL 9610, at *4). "In other words, for a breach of contract to be material, it must 'go to the root' or 'essence' of the agreement between the parties, or be 'one which touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract.'" *Id.* (citation omitted); *see also* 23 *Williston on Contracts* § 63:3 (4th ed.). Whether a breach is material is ordinarily a question of fact. *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008) (citations omitted).

Before the Court can determine whether there is a genuine dispute of material fact as to whether either or both parties breached the contracts at issue, however, it must first interpret the provisions of the contracts to determine the parties' respective obligations. "If the terms of the contract 'are clear on their face, . . . the court must apply the meaning that would be ascribed to the language by a reasonable third party.'" *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (quoting *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 38 (Del. Ch. 1997)). "If, however, the court concludes that a contract's terms are ambiguous or 'fairly susceptible of different interpretations,' the court may consider extrinsic evidence to uphold, to the extent possible, the reasonable shared expectations of the parties at the time of contracting." *Id.* (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)). However, "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

The parties agree that the LTRC, the 2015 MOA, and PCC-32 incorporate GP1, which sets forth various terms governing the parties' relationship over the course of the AH-6i program. (Docs. 16 at 31 ¶ 137; 29 at 12 ¶ 137 ("MDHI admits the LTRC and the 2015 MOA incorporate GP1."); 125 at 2 ¶¶ 2–3; 136 at 2 ¶ 2). Of note, Article 2(a) of GP1 provides that "Seller shall strictly adhere to the shipment or delivery schedules" and requires MDHI, as the Seller, to "promptly notify" Boeing in writing of any actual or anticipated delays, including delays attributed to labor disputes. (Doc. 127-1 at 44).

Article 7(b) of GP1 states that if MDHI "delivers non-conforming Goods," Boeing "may at its option and at Seller's expense (i) return the Goods for credit or refund; (ii) require Seller to promptly correct or replace the Goods; (iii) correct the Goods; or (iv) obtain replacement Goods from another source." (*Id.* at 45). Under Article 7(c), "[r]epair, replacement and other correction and redelivery shall be completed within the original delivery schedule or such later time as Buyer's Authorized Procurement Representative may reasonably direct." (*Id.*). Moreover, Article 7(d) provides that "[a]ll costs and expenses and loss of value incurred as a result of or in connection with nonconformance and repair, replacement or other correction may be recovered from Seller by equitable price reduction or credit against any amounts that may be owed to Seller under this contract or otherwise." (*Id.*).

GP1's warranty clause in Article 8(a) states:

> Seller warrants that all Goods furnished under this contract shall conform to all specifications and requirements of this contract and shall be free from defects in materials and workmanship. To the extent Goods are not manufactured pursuant to detailed designs and specifications furnished by Buyer, the Goods shall be free from design and specification defects. This warranty shall survive inspection, test and acceptance of, and payment for, the Goods. This warranty shall run to Buyer and its successors, assigns and customers. Such warranty shall begin after Buyer's final acceptance. Buyer may, at its option, either (i) return for credit or refund, or (ii) require prompt correction or replacement of the defective or non-conforming Goods. Return to Seller of defective or

nonconforming Goods and redelivery to Buyer of corrected or replaced Goods shall be at Seller's expense. Goods required to be corrected or replaced shall be subject to this article and the "inspection" article of this contract in the same manner and to the same extent as Goods originally delivered under this contract, but only as to the corrected or replaced part or parts thereof. *Even if the parties disagree about the existence of a breach of this warranty, Seller shall promptly comply with Buyer's direction to: (i) repair, rework or replace the Goods, or (ii) furnish any materials or parts and installation instructions required to successfully correct the defect or nonconformance.* If the parties later determine that Seller did not breach this warranty, the parties shall equitably adjust the contract price.

(*Id.* (emphasis added)).

The dispute provision of GP1, Article 12 provides that, "[p]ending final resolution of any dispute, Seller shall proceed with performance of this contract according to Buyer's instructions so long as Buyer continues to pay amounts not in dispute." (*Id.* at 46). Article 15(a), GP1's provision regarding cancellation for default, states that Boeing "*may*, by written notice to [MDHI], cancel all or part of this contract" if MDHI "fails to deliver the Goods within the time specified by this contract or any written extension[.]" (*Id.* (emphasis added)). Further, Article 15(b) states that "Seller shall continue work not canceled[,]" (*id.*), while Article 15(d) states that "Buyer shall pay the contract price for Goods accepted[,]" (*id.* at 47).

The rights and remedies provision of GP1, Article 26, specifies:

Any failures, delays or forbearances of either party in insisting upon or enforcing any provisions of this contract, or in exercising any rights or remedies under this contract, shall not be construed as a waiver or relinquishment of any such provisions, rights or remedies; rather, the same shall remain in full force and effect. Except as otherwise limited in this contract, the rights and remedies set forth herein are cumulative and in addition to any other rights or remedies that the parties may have at law or in equity. If any provision of this contract is or becomes void or unenforceable by law, the

remainder shall be valid and enforceable.

(*Id.* at 49).

Finally, the LTRC incorporates various Boeing Standard Clauses, including Boeing's H900 Additional General Provisions Clause ("H900 Clause"). (*See* Doc. 127-1 at 22–23). Section 20 of the H900 Clause concerns delivery payment terms, and states:

> Payment will be made in accordance with the Invoice and Payment article of this Contract. Notwithstanding the foregoing, in the event Seller's average monthly delivery rating under this purchase contract drops below 96% On-Time, as measured over the three most recent months in Buyer's BEST System, Buyer and Seller will first work together to resolve the delivery performance issues, which efforts will include the timely, progressive escalation of the delivery performance issues through the management of both Parties, as necessary. If after a reasonable time the Parties are unable to come to a mutually agreeable resolution that results in the improvement of Seller's average monthly delivery ratings, as measured in accordance with the foregoing, the Parties agree that Buyer shall then have the right to adjust the delivery payment terms of this Contract. Such adjustment to the delivery payment terms will be calculated by adding Seller's average days late, as recorded over the three most recent months in Buyer's BEST System, rounded up to a multiple of 30 days, to the standard net 30 days delivery payment term. Seller agrees the payment due date for Seller invoices may remain extended by Buyer by the average number of days late until Seller's average days late, as measured in accordance with the foregoing, is improved to no less than 96%.

(Doc. 16-3 at 53).

With this background of the relevant terms and provisions, the Court now considers the parties' breach of contract claims.

### 1. MDHI's Breach of Contract Claim

According to MDHI, the parties "entered into a valid and enforceable contract for the sale of AH-6i airframes pursuant to the terms set out in the 2015 MOA." (Doc. 9 at

7 ¶ 33). MDHI states that it "produced and delivered all 24 airframes to Boeing under the LTRC and associated PC, as modified by the 2015 MOA." (Doc. 146 at 7). However, MDHI alleges that Boeing has materially breached the 2015 MOA by failing and refusing to: (i) make performance-based payments for line-loading airframes 14, 23, and 24; (ii) make final delivery payments for airframes 14, 22, 23, and 24; and (iii) pay MDHI's invoice for Pressure Switches that MDHI supplied at Boeing's request. (*Id.*; *see* Doc. 147 at 3–4 ¶ 7). MDHI contends that Boeing's alleged breach has caused MDHI $3,808,775 in damages due and owing under invoices 194375, 7926715, 8019451, 8019453, 7953638, 7988197, 8066389, and 8070519, in addition to prejudgment interest, costs, and attorneys' fees. (Docs. 146 at 7–8; 147 at 4 ¶ 8).

Boeing does not dispute the existence or validity of the contracts at issue, but contends that MDHI has not fulfilled its obligations under the parties' contracts or fully performed such that the invoices at issue are not due and payable. (Docs. 16 at 4 ¶ 29; 137 at 2, 8). While Boeing "admits that it is in possession of the AH-6i airframes MDHI delivered," (Doc. 16 at 4 ¶ 29), Boeing states that "MDHI's right to the contract price was contingent on its timely delivery of conforming goods," (Doc. 137 at 2). Nevertheless, "MDHI failed to deliver *any* of the 24 Airframes on time, shipped Airframe 24 six months late and incomplete, then reneged on its contractual obligation and affirmative commitment to complete Airframe 24—none of which can be disputed." (*Id.*).[12] Further, Boeing avers that MDHI's failure to timely deliver conforming parts required Boeing to spend thousands of hours fixing these defects, thereby incurring significant costs and material disruptions to the efficiency and effectiveness of Boeing's assembly line. (*Id.* at 9; *see also* Doc. 138 at 9–13, 36 ¶¶ 19–24, 34). Boeing also contends that it has incurred costs resulting from MDHI's delayed and defective airframes which are substantially greater than the payments

---

[12] According to Boeing, MDHI's delivery of Airframe 24 was incomplete and nonconforming. (Doc. 138 at 5). Boeing states that it only accepted delivery of Airframe 24 "upon MDHI's promise to complete the installation of those missing components at Boeing's facility when they became available," but MDHI never did so. (*Id.*). Boeing further avers that its "acceptance of Airframe 24 was subject to a condition subsequent, MDHI's completion of Airframe 24, that MDHI failed to satisfy." (*Id.* at 6).

MDHI claims are owed and which are recoverable from MDHI as either an "equitable price reduction" or "credit against any amounts that may be owed." (Doc. 138 at 5 ¶ 7; *see also* Doc. 137 at 8). In support, Boeing cites Article 7(d) of GP1, which provides that "[a]ll costs and expenses and loss of value incurred as a result of or in connection with nonconformance and repair, replacement or other correction many be recovered from Seller by equitable price reduction or credit against any amounts that may be owed to Seller under this contract or otherwise." (*Id.* (citing Doc. 127-1 at 45)).[13]

Under Delaware law, MDHI "must demonstrate substantial compliance with all the provisions of his contract" in order "to recover damages for any breach of contract[.]" *Emmett S. Hickman Co.*, 251 A.2d at 573 (citing *Carroll*, 91 A. at 1003). "A good faith attempt to perform a contract, even if the attempted performance does not precisely meet the contractual requirement, is considered complete if the substantial purpose of the contract is accomplished." *Marcano v. Dendy*, No. CIV.A. 2006-01-314, 2007 WL 1493792, at *6 (Del. Com. Pl. May 22, 2007) (citing *Del. Civ. Pattern Jury Instructions* § 19.18 (1998)). "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *In re Exide Techs.*, 607 F.3d 957, 963 (3d Cir. 2010); *see Kyle v. Apollomax, LLC*, 987 F. Supp. 2d 519, 526 (D. Del. 2013) (finding a genuine dispute of material fact as to whether former member of LLC substantially performed under terms of operating agreement, thus precluding summary judgment on claim against LLC and

---

[13] Although Boeing appears to argue that its contractual right to offset in Article 7(d) of GP1 functions as a defense "against any amounts otherwise owed," (Doc. 137 at 8), set-offs "are properly taken only as to judgments, not claims." *Seibold v. Camulos Partners LP*, No. CIV.A. 5176-CS, 2012 WL 4076182, at *24 n.233 (Del. Ch. Sept. 17, 2012) ("a set-off cannot be taken preemptively against *claims*, and instead must be formally asserted as a reduction against a 'liquidated and demandable' debt") (citing 80 C.J.S., *Set–Off and Counterclaim* § 3 (updated 2012)); *see* 80 C.J.S., *Counterclaim* § 9 (updated 2012) "The term counterclaim is generic in nature and includes those defenses universally known as recoupment and set-off.") (citing *U.S. for Use & Benefit of Greenville Equip. Co. v. U.S. Cas. Co.*, 218 F. Supp. 653, 657 (D. Del. 1962)); *see also Matter of GEC Indus., Inc.*, 128 B.R. 892, 899 (Bankr. D. Del. 1991) ("The principle of setoff permits parties that owe mutual debts to each other to state the accounts between them, subtract one from the other and pay only the balance."). Even so, Boeing's contractual offset argument highlights Boeing's contention that MDHI cannot show that it has fully performed. (Doc. 137 at 8).

managing member for breach of operating agreement).

Here, the contracts between the parties require that MDHI "strictly adhere to the shipment or delivery schedules," (Doc. 127-1 at 44 (Article 2 of GP1)), and necessitate that MDHI furnish goods "free from defects in materials and workmanship" or else "free from design and specification defects," (*id.* at 45 (Article 8(a) of GP1)). Further, MDHI must "promptly comply" with Boeing's "direction to: (i) repair, rework or replace the Goods, or (ii) furnish any materials or parts and installation instructions required to successfully correct the defect or nonconformance[,]" even where "the parties disagree about the existence of a breach of this warranty." (*Id.* (Article 8(a) of GP1)). Finally, MDHI must, "[p]ending final resolution of any dispute, . . . proceed with performance of this contract according to Buyer's instructions so long as Buyer continues to pay amounts not in dispute." (*Id.* at 46 (Article 12 of GP1)).

Despite these contractual requirements, however, Boeing presented evidence that: MDHI failed to deliver any of the 24 Airframes on time; that each of the final seventeen airframes suffered from a significant number of defects and contained nonconforming parts; and that MDHI shipped Airframe 24 incomplete, but then did not complete the work it was required to finish on that airframe. (Docs. 137 at 8–9; 138 at 32–34 ¶¶ 11, 17–24).[14] In opposition, MDHI avers that Boeing's own conduct caused the changes in the delivery schedule, disputes that the deliveries of Airframes 8 through 24 were "actionably" late under Article 2 of GP1, states that Boeing's own design and production errors impacted its ability to produce all 24 helicopters by July 2017, and claims that it was relieved from any obligation to install the short parts on Airframe 24 when Boeing failed to pay its invoices. (Docs. 136 at 1–3 ¶¶ 1, 3–4; 147 at 11 ¶ 28). Accordingly, the Court finds that there is a genuine dispute of material fact as to whether MDHI substantially performed its contractual obligations. Therefore, the Court declines to grant summary judgment to MDHI

---

[14] (*See also* Docs. 125-1 at 76–77 (contract letter dated June 28, 2017 whereby Boeing authorized MDHI to ship short Airframe 24 and requiring MDHI to complete installations upon receipt of the missing part); 136 at 2 ¶ 4 ("MDHI does not dispute that the delivery dates for airframes 8-24 post-date the delivery dates in PCC-32.")).

on its claim for breach of contract.[15]

In its Amended Complaint, MDHI also asserts, in the alternative, a claim for breach of the implied covenant of good faith and fair dealing. (Doc. 9 at 8 ¶ 45). However, in its Motion for Summary Judgment, MDHI does not advance any arguments explaining why it believes it is entitled to summary judgment on that claim. (*See* Doc. 146). Therefore, the Court also declines to grant summary judgment to MDHI on its claim for breach of the implied covenant of good faith and fair dealing.

### 2. Boeing's Third Counterclaim for Breach of the LTRC and Fifth Counterclaim for Breach of the 2015 MOA and PCC-32

Boeing's Third Counterclaim alleges that MDHI materially breached its obligations under the LTRC by failing to supply parts that are free from defects in materials and workmanship and by failing to promptly fix any defects identified by Boeing. (Doc. 16 at 30–31 ¶¶ 131–35).[16] Boeing Fifth Counterclaim alleges that MDHI breached the 2015 MOA and PCC-32 by:

> (a) fail[ing] to deliver the airframes according to the agreed-upon schedule; (b) creating substantial workmanship issues,

---

[15] In its Reply and at oral argument, MDHI also argues that it is entitled to summary judgment on its breach of contract claim on the grounds that Boeing allegedly waived the right to withhold payment by inducing MDHI to deliver all 24 airframes, and on the grounds that Boeing's invoice to the United States Government is an admission that Boeing owes MDHI the $3.8 million. (*See* Doc. 142 at 3–6). MDHI did not, however, make these arguments in its Motion for Summary Judgment regarding its own breach of contract claim; rather, MDHI only made these arguments in its Motion in an effort to demonstrate that it is entitled to summary judgment on Boeing's counterclaims. (*See* Doc. 146 at 8–9). Regardless of whether these arguments were properly raised in regard to MDHI's breach of contract claim for the first time in MDHI's Reply and at oral argument, the Court has already determined that there is a genuine dispute of material fact as to whether or not MDHI substantially complied with the contracts at issue—a requirement to recover damages for breach of those contracts under Delaware law. *See Emmett S. Hickman Co.*, 251 A.2d at 573. Therefore, the Court sees no need to consider these two arguments as to MDHI's breach of contract claim, but will consider them, *infra*, as to Boeing's counterclaims.

[16] The Court's April 23, 2018 Order dismissed Boeing's first allegation under its Third Counterclaim—specifically, that MDHI breached "its contractual obligation not to undertake any action or communicate any information to maliciously or unfairly influence Boeing's efforts to sell and support its AH-6i." (Doc. 50 at 11 (citing Doc. 16 at 31)). Accordingly, only parts "b" and "c" of Boeing's Third Counterclaim remain. (*See* Doc. 16 at 30–31 ¶ 134).

resulting in an excessive number of SRMRBs and delay and disruption to the AH-6i program, which caused substantial costs for Boeing; (c) fail[ing] to submit complete and accurate information about manufacturing defects, resulting in increased time and effort to address SRMRBs; (d) delivering airframes with cracked transmissions; (e) fail[ing] to assure supplier completion of non-destructive testing on the AH-6i tail boom and fuselage, and fail[ing] to provide Boeing with critical documentation; (f) us[ing] [] unapproved materials; (g) fail[ing] to maintain critical production equipment; and (h) fail[ing] to work with Boeing to remedy problems and expedite delivery.

(*Id.* at 32–33 ¶¶ 143–47).

According to Boeing, execution of the AH-6i program was delayed and disrupted as a result of MDHI's failure to timely deliver AH-6i airframes, delivery of nonconforming parts, and failure to supply or fix certain parts. (Docs. 137 at 2, 4–6, 9; 138 at 36 ¶ 34). As a result of these performance failures, Boeing states that it has suffered approximately $6.2 million in damages, including: "(i) correction costs incurred in addressing hundreds of nonconforming parts; (ii) delay costs caused by MDHI's failure to timely deliver and complete performance of Airframe 24; and (iii) disruption costs associated with inefficiencies and other incremental costs incurred because of the nonconformances and delays in delivery as to each of Airframes 8–24." (Doc. 138 at 36 ¶ 34 (citing expert report of Cheryl Lee Van at Doc. 127-8 and 127-9)).

As discussed, *supra*, there is a genuine dispute of material fact as to whether MDHI substantially performed its contractual obligations. "Substantial performance is performance without a material breach, and a material breach results in performance that is not substantial." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 317 n.8 (3d Cir. 2001) (citation omitted). "[W]here there is a substantial performance, there can be no material breach. This does not mean, however, that substantial performance precludes a non-material breach. Parties suffering non-material breaches are not excused from performance as they would be had they suffered a material breach, but they still may

recover damages." *Clean Harbors, Inc. v. Union Pac. Corp.*, No. CV-N15C-07-081-MMJ-CCLD, 2017 WL 5606953, at *4 (Del. Super. Ct. Nov. 15, 2017), *aff'd*, 201 A.3d 1161 (Del. 2019). Therefore, because "[t]he doctrine of material breach is simply the converse of the doctrine of substantial performance[,]" *Gen. Motors Corp.*, 263 F.3d at 317 n.8, the Court finds that there is also a genuine dispute of material fact as to whether MDHI materially breached its obligations imposed by the contracts at issue.

Even so, MDHI contends that it is entitled to summary judgment on Boeing's breach of contract counterclaims for two main reasons, specifically because: (a) Boeing waived any contractual rights to withhold payments or seek damages by inducing MDHI to continue performing; and (b) Boeing's $6.2 million damages claim lacks any basis in law or fact. (*See* Docs. 142, 146). For the following reasons, however, the Court finds that there is a genuine dispute of material fact precluding summary judgment on Boeing's breach of contract counterclaims.

### a.  Whether Boeing Waived Its Contractual Rights to Withhold Payments or Seek Damages

MDHI asserts that Boeing "waived any claim for material breach by inducing MDHI to continue providing nine additional airframes at a time when Boeing knew of the alleged material breach." (Doc. 146 at 8). According to MDHI, Boeing hid its plan to "hit MDHI" with an "after the fact" damages claim until MDHI had delivered all 24 airframes because "Boeing recognized that if MDHI became aware of Boeing's plan to wait until after airframe 24 was delivered to make its combined damages claim on all prior airframes, MDHI would stop supplying parts that might be needed for the remainder of the aircraft." (Docs. 146 at 9; 147 at 6–7 ¶¶ 14, 18). In doing so, MDHI argues that Boeing "waived its right to assert a $6.2 million damages claim as a matter of law." (Doc. 146 at 9).[17]

---

[17] In support of its waiver argument, MDHI cites *Pima Farms Co. v. Fowler*, 258 P. 256, 258 (Ariz. 1927). (Docs. 142 at 3; 146 at 8). There, the Arizona Supreme Court stated:

> We believe it is the universal rule that a party to a contract having the option or right, because of a breach thereof by the other party, to terminate it, but who stands by and permits the other party to go ahead doing the things required of him, will

It is true that:

> [w]here there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform.

*In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at \*14 (Del. Ch. Jan. 25, 2013) (citing 14 *Williston on Contracts* § 43:15 (4th ed. 2004)). Nevertheless, Boeing counters that the material breach waiver doctrine does not apply because Boeing "does not cite MDHI's breach as a basis for discharging Boeing's own performance obligations." (Doc. 137 at 10). Rather, Boeing concedes that it "owes MDHI for its products, but what Boeing owes is subject to the offsets the contract permits." (*Id.*). Therefore, Boeing asserts that any argument that Boeing has waived its claims for material breach is a red herring because Boeing seeks to enforce—not terminate—the AH-6i contracts. (*Id.* at 9).

---

> be treated as having waived the breach, *and be denied the right to assign it, if sued on the contract, as an excuse for not himself performing.*

*Pima Farms Co.*, 258 P. at 258 (emphasis added). However, when citing this case, MDHI left off the italicized portion of this sentence explaining the applicability of the waiver doctrine. (*See* Doc. 142 at 3 (ending the quote with a period after "will be treated as having waived the breach" but not utilizing brackets around that period to indicate the alteration in the quoted material); 146 at 8 (ending the quote with an ellipsis after "will be treated as having waived the breach")).

As the full quoted sentence from *Pima Farms Co.* illustrates, however, the waiver doctrine only applies when a party attempts to excuse its own non-performance by citing the opposing party's material breach. *See In re Mobilactive Media, LLC*, No. CIV.A. 5725-VCP, 2013 WL 297950, at \*14 (Del. Ch. Jan. 25, 2013) ("Silverback accepted the benefits of Bienstock's performance of the Mobilactive Agreement, but now asserts that his failure to perform a part of the Agreement, which Silverback itself failed to perform, should preclude Bienstock from recovering. By continuing to accept the benefits of the contract, however, Silverback essentially admitted to its validity, and is estopped from arguing voidability."); *DeMarie v. Neff*, No. CIV.A. 2077-S, 2005 WL 89403, at \*5 (Del. Ch. Jan. 12, 2005) ("[T]he nonbreaching party may not, on the one hand, preserve or accept the benefits of a contract, while on the other hand, assert that contract is void and unenforceable.").

The Court agrees with Boeing that the material breach waiver doctrine is inapplicable because Boeing is not attempting to excuse its *own* non-performance by treating MDHI's alleged material breach as terminating the contract. *See TriZetto Grp., Inc. v. eHealth Partners, Inc.*, No. CV 08-162-PHX-SRB, 2009 WL 10673486, at *3 (D. Ariz. Jan. 22, 2009) (stating that the material breach waiver doctrine is "only applicable if the victim of the breach treats the other party's actions as terminating the contract" and, therefore, concluding that because the defendant "did not provide notice of the alleged breach or treat the contract as terminated[,]" it could not "assert that [the plaintiff's] breach relieves it" of its contractual obligations); *see also In re Mobilactive Media, LLC*, 2013 WL 297950, at *14 ("By continuing to accept the benefits of the contract, however, Silverback essentially admitted to its validity, and is estopped from arguing voidability."). The evidence provided by Boeing demonstrates that following MDHI's incomplete and nonconforming delivery of Airframe 24 and despite MDHI's refusal to deliver warranty items, Boeing did not seek to terminate the contract; instead, Boeing notified MDHI "that Boeing was exercising its right to extend the delivery payment terms in accordance with the length of any MDHI performance delays" pursuant to Section 20 of the H900 Clause. (Doc. 138-2 at 5).[18] Indeed, Senior Counsel for Boeing avers that "[w]hile MDHI's performance under its airframe production contract was deficient in many respects, Boeing did not terminate that contract and instead insisted on MDHI's performance since it determined that no other supplier could deliver airframes on time to allow Boeing to fulfill its contract with the Army." (Doc. 138-3 at 39, Asplund Decl. ¶ 5).

The contracts at issue give Boeing the option to terminate for non-performance or insist on performance. Specifically, Article 15 of GP1 states that Boeing "*may*, by written

---

[18] Section 20 of the H900 Clause gives Boeing the right to adjust the delivery payment terms in the event MDHI's on-time delivery rate falls below 96% on-time. (Doc. 16-3 at 53). Boeing asserts that it provided a reasonable amount of time to resolve the delivery delays, and "put MDHI on notice that future adjustments might be necessary depending on MDHI's performance." (Doc. 16 at 26 ¶ 107 (citing Doc. 16-3 at 103–4 (August 4, 2016 letter from Boeing notifying MDHI of "its intent to modify the payment terms to account for late deliveries of airframes and kits" pursuant to Article 20 of the H900 Clause))).

notice to [MDHI], cancel all or part of this contract" if MDHI "fails to deliver the Goods within the time specified by this contract or any written extension[,]" and requires MDHI to "continue work not canceled." (Doc. 127-1 at 46 (emphasis added)). Article 12 also specifies that "[p]ending final resolution of any dispute, Seller shall proceed with performance of this contract according to Buyer's instructions so long as Buyer continues to pay amounts not in dispute." (*Id.*). In accordance with these provisions, Boeing "insisted on performance." (Doc. 137 at 9).

Not only is the Court unconvinced by MDHI's argument that the waiver doctrine applies to bar Boeing's counterclaims seeking damages for MDHI's alleged breach, but the Court is also unpersuaded by MDHI's argument that Boeing waived its contractual right to offset under Article 7(d) by inducing MDHI to continue performing after MDHI's alleged breach. (*See* Docs. 142 at 3 ("MDHI is [e]ntitled to [s]ummary [j]udgment on the [c]ontract [c]laims and [c]ounterclaims [b]ecause Boeing [h]as [w]aived the [r]ight to [w]ithold [p]ayment[.]"); 146 at 8). Where Boeing insists on performance in accordance with Articles 12 and 15 of GP1, Article 26 of that same contract provides Boeing with the right to cumulative remedies "in addition to any other rights or remedies that the parties may have at law or in equity[,]" (Doc. 127-1 at 49), such as the rights to cover, incidental damages, and consequential damages under the UCC. GP1 also provides Boeing with the right to offset in Article 7(d). (*See id.* at 45 ("All costs and expenses and loss of value incurred as a result of or in connection with nonconformance and repair, replacement or other correction may be recovered from Seller by equitable price reduction or credit against any amounts that may be owed to Seller under this contract or otherwise.")). Under these contractual provisions, Boeing is not forced to choose between performance and offset. Rather, "[t]hey necessarily work together to give Boeing the benefit of the contractual bargain." (Doc. 137 at 9).

Furthermore, "[f]or the doctrine of waiver to apply, the Court must be persuaded that the party intended to voluntarily relinquish a known right. The intent to relinquish is a prerequisite to applying waiver as an equitable defense." *Norberg v. Sec. Storage Co. of*

*Washington*, No. 12885, 2000 WL 1375868, at *7 (Del. Ch. Sept. 19, 2000) (citing *Realty Growth Inv'rs v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982)). "The issue whether a wavier has occurred is typically one of fact for the jury." 23 *Williston on Contracts* § 63:9 (4th ed. 2018); *see Star of the Sea Ass'n of Owners v. Dayton*, No. CIV.A. 85A-JL5, 1986 WL 9022, at *3 (Del. Super. Ct. Aug. 13, 1986) ("Waiver is ordinarily an issue for the trier of fact[.]"); *N. Arizona Gas Serv., Inc. v. Petrolane Transp., Inc.*, 702 P.2d 696, 705 (Ariz. Ct. App. 1984) ("Whether a right has been waived is a question of fact for the trial court."). Here, Boeing presents evidence contradicting MDHI's contention that Boeing voluntarily relinquished its right to offset. Boeing points out that it "repeatedly complained about performance issues, issued reservation of rights letters, and refused to pay certain invoices when issued." (Doc. 137 at 11 (citing Doc. 138 at 7 ¶ 15); *see* Doc. 138-2 at 5–6 (August 2, 2017 letter from Boeing to MDHI); *id.* at 9–10 (May 24, 2016 letter from Boeing to MDHI); *id.* at 12–14 (June 6, 2016 letter from Boeing to MDHI); *id.* at 16–18 (July 13, 2016 letter from Boeing to MDHI); Doc. 16-3 at 103–104 (August 4, 2016 letter from Boeing to MDHI)). In these letters, Boeing repeatedly and specifically told MDHI that it "reserves and does not waive any rights it may have under the applicable contracts, at law or in equity." (Doc. 138-2 at 6; *see also id.* at 14, 18).

Although MDHI counters that "Boeing cannot avoid the equitable waiver doctrine by including a generic sentence in a series of letters demanding MDHI's continued performance[,]" Boeing's communications with MDHI go far beyond the general reservations found inadequate in the cases MDHI cites. (Doc. 142 at 4–5 (citing *Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1316 (Ct. Cl. 1976); *Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 650 (2004))). Indeed, Boeing's communications explicitly and unequivocally apprised MDHI that Boeing planned on seeking damages from MDHI due to MDHI's alleged deficient and untimely performance.[19] For example, in its May 24, 2016 letter, Boeing expressly stated that it "will

---

[19] Notably, Del. Code. Ann. Tit. 6 § 2-717 provides that a "buyer on notifying the seller of his or her intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." The comments to this statute indicate that "no formality of notice is required and any

hold MDHI liable for all damages incurred as a result of MDHI's delays in delivering AH-6i Airframes, Kits and other components of its Work Share." (Doc. 138-2 at 10). Similarly, in its August 2, 2017 letter, Boeing confirmed that Boeing "will initiate activities to complete the unfinished work on Airframe #24 and seek recovery of resulting costs and damages from MDHI." (*Id.* at 6).

Not only has Boeing presented evidence contradicting MDHI's contention that Boeing voluntarily relinquished its right to offset, but Article 26 of GP1 unequivocally states that "[a]ny failures, delays or forbearances of either party in insisting upon or enforcing any provisions of this contract, or in exercising any rights or remedies under this contract, shall not be construed as a waiver or relinquishment of any such provisions, rights or remedies; rather, the same shall remain in full force and effect." (Doc. 127-1 at 49; *see also id.* at 87 (similar provision in 2015 MOA)). Furthermore, as Boeing notes, there is no contract term that requires Boeing to affirmatively disclose an intent to exercise its contractually authorized offset right as a condition precedent for its exercise. (Doc. 137 at 11). For these reasons, the Court is also unpersuaded by MDHI's argument that Boeing waived its contractual right to offset under Article 7(d) by inducing MDHI to continue performing after MDHI's alleged breach.

### b. Whether Boeing's Damages' Claim Lacks Any Basis in Law or Fact

To satisfy the third and final element of their breach of contract counterclaims, Boeing must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from MDHI's violation of the contracts. *LaPoint v. AmerisourceBergen Corp.*, No. CIV.A. 327-CC, 2007 WL 2565709, at *9 (Del. Ch. Sept. 4, 2007), *aff'd*, 956 A.2d 642 (Del. 2008) (citing *Carlson v. Hallinan*, 925 A.2d 506, 540 (Del. Ch. 2006)). MDHI alleges that Boeing's $6.2 million damages claim lacks any basis in law or fact for two reasons: (i) because Boeing's invoice to the United States

language which reasonably indicates the buyer's reason for holding up his payment is sufficient." Uniform Commercial Code Comment 2, Del. Code Ann. tit. 6, § 2-717.

Government is an admission that it owes MDHI $3.8 million; and (ii) because Boeing has failed to apportion the $3.8 million in delay damages and $800,000 in disruption damages. (*See* Docs. 142, 146). However, after reviewing the parties' arguments and exhibits, the Court finds that Boeing has presented sufficient evidence satisfying the third element of its breach of contract counterclaims, thus establishing its prima facie case.

i. Whether Boeing's Invoice to the United States Government is an Admission that Boeing Owes MDHI $3.8 Million

MDHI argues that Boeing's counterclaims fail because Boeing represented to the United States Government that its production costs included the $3,808,775 that Boeing has refused to pay MDHI, thus admitting that it owes MDHI this sum. (Docs. 142 at 5; 146 at 9). According to MDHI, Boeing never informed the government that it withheld this sum from MDHI. (Doc. 146 at 9). "Given Boeing's representation to the USG that its costs included the full amount of its MDHI contract," MDHI asserts that "Boeing cannot now avoid paying the remaining $3.8 million owed to MDHI without violating the False Claims Act." (*Id.*).

In its Response and at oral argument, Boeing avers that it accurately reported its contractual obligations in connection with the AH-6i program to the government, including the price it has not paid to MDHI. (Doc. 137 at 12). Moreover, Boeing does not dispute that it owes MDHI for its products. (*See id.* at 10 ("Boeing owes MDHI for its products, but what Boeing owes is subject to the offsets the contract permits.")). Rather, Boeing contends that MDHI's argument here ignores the "clear contract provisions justifying Boeing's offsets." (*Id.* at 12). Indeed, Boeing clarified at oral argument that it is not asserting that it does not have to pay the $3.8 million owed to MDHI in some way, shape, or form, but that those invoiced amounts are not currently due and payable because Boeing has a contractual right to offset. Therefore, Boeing states that its counterclaims for more than $6 million dollars in damages will be offset, dollar for dollar, by MDHI's $3.8 million in invoices. The Court does not agree with MDHI that this "admission" on Boeing's part

entitles MDHI to summary judgment, especially given the Court's prior determination, *supra*, that there is a genuine dispute of material fact as to whether MDHI substantially performed (and/or materially breached) the contracts at issue.

As to MDHI's accusation that Boeing has violated the False Claims Act and that this alleged violation also somehow entitles MDHI to summary judgment, the Court again disagrees. Rather, "[i]f, as MDHI apparently contends, Boeing misled its customer, the appropriate remedy would be for the customer to seek a refund—not to allow MDHI to obtain a windfall." (Doc. 137 at 12). As Boeing so aptly put it at oral argument, MDHI does not get a get-out-of-jail free card if Boeing allegedly said something to the government which wasn't true.

In response, MDHI asserts that because "Boeing seeks an 'equitable price adjustment,' which, as the name suggests, depends on the equities of the situation[,]" Boeing must have "'acted fairly and without fraud or deceit as to the controversy in issue.'" (Doc. 142 at 6 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945)).[20] Nevertheless, as Boeing points out, (Doc. 137 at 12), MDHI fails to point to any authority demonstrating that Boeing has committed a False Claims Act violation or somehow violated procurement regulations by not reporting to the government the contractual offsets it seeks in litigation with a sub-contractor.[21] Moreover,

---

[20] Although MDHI cites *Transfer My Timeshare, LLC v. Selway*, No. CIV. 08-CV-118-JL, 2009 WL 3271326, at *4 (D.N.H. Oct. 9, 2009), and *G4S Technology LLC v. Massachusetts Technology Park Corp.*, 99 N.E.3d 728, 742–43 (Mass. 2018), in support of its argument that one who comes to the Court in equity must come with clean hands, neither of these cases demonstrate how Boeing's actions here rose to fraudulent, unfair, or deceitful conduct. In *Transfer My Timeshare, LLC*, for example, the court determined that the defendant was barred by the doctrine of unclean hands to her right to recoupment because she had embezzled more than $300k in cash and contract rights from the corporation. *Transfer My Timeshare, LLC*, 2009 WL 3271326, at *4. Therefore, the Court determined that allowing the defendant to recoup the inflated price of her interest would have essentially rewarded her for concealing her misconduct and denied the award as manifestly unjust. *Id.* In *G4S Technology LLC*, the court merely noted the importance of clean hands in determining equitable relief under the doctrine of quantum meruit, ultimately concluding that there was a genuine dispute of material fact on the quantum meruit claim. *G4S Tech. LLC*, 99 N.E.3d at 742.

[21] Although MDHI cites to *Lamb Engineering & Construction Co. v. United States*, 58 Fed. Cl. 106, 110–11 (2003), for support, the court's conclusion there is inapposite to the case at bar. There, the court determined that the plaintiff violated the False Claims Act by certifying that its subcontractors had been paid when the contractor knew they had not.

the Court is unconvinced that Boeing acted fraudulently, deceitfully, or unfairly by seeking its contractual right to offset. Finally, because Boeing's contract with the U.S. Government had a firm, fixed price that was set before Boeing withheld any payments from MDHI to offset its damages, Boeing claims it could not have recovered more from the Government than it was entitled. (Docs. 137 at 12; 138 at 6 ¶ 10). For these reasons, the Court declines to grant summary judgment in favor of MDHI based on these arguments.

ii.  Whether Boeing Failed to Apportion its Delay and Disruption Damages

MDHI next argues that it is entitled to summary judgment on Boeing's counterclaims because Boeing failed to apportion its damages to account for delay and disruption costs Boeing itself caused, or that were caused by suppliers other than MDHI. (Docs. 142 at 6, 146 at 10). In opposition, Boeing asserts that it "has apportioned damages through the expert report of Ms. LeeVan, who carefully included the costs caused by MDHI's performance failures and excluded costs that could not be tied back to those performance failures." (Doc. 137 at 13). First, Boeing sets forth evidence that although Boeing's contract with the government to deliver 24 helicopters was for approximately $235 million, Boeing incurred costs amounting to more than $260 million. (Doc. 138 at 6 ¶ 10). Consequently, Boeing lost approximately $25 million on this contract. Of the amount lost on this contract, Boeing states that it allocated just a small fraction to MDHI, each item of which was specified with particularity in Ms. LeeVan's report. Although MDHI replies that Boeing's damages claim is "an all-or-nothing proposition" assuming that "MDHI is 100% to blame for all alleged delays and disruptions in delivering aircraft to the USG by July 2017[,]" (Doc. 142 at 5), Boeing reiterated at oral argument that it is

---

*Id.* The court determined that the plaintiff had satisfied the "knowingly" requirement necessary to find a violation of the False Claims Act by inserting clauses in its subcontracts providing for it to retain funds in violation of the Federal Acquisition Regulation and Prompt Payment Act (which require that subcontractors be paid within seven days), and by certifying its final progress billing despite still having failed to pay its subcontractors. *Id.* In contrast, here, Boeing does not dispute that it owes MDHI the $3.8 million included in its costs to the government but does dispute that this amount is currently due and payable. (Doc. 137 at 10, 12). Thus, the situation here is quite unlike the case in *Lamb Engineering & Construction Co.*

not claiming that 100% of its losses are MDHI's responsibility, but, rather, claiming that 100% of the losses caused by MDHI should be MDHI's responsibility. According to Boeing, Ms. LeeVan ties 100% of the damages Boeing requests from MDHI to MDHI's purported performance failures.

Second, Boeing presents evidence that Ms. LeeVan considered, and rejected, some other possible causes of delay. (*See* Doc. 128-4 at 814, LeeVan Dep. 247:21–248:6 (when asked whether Airframe 24 was missing other critical parts that may have caused the eight-month delay, Ms. LeeVan responded that "there were no parts that Boeing could not have a work around for in order to deliver Aircraft 24.")).[22] Citing *United States v. Sierra Pacific Industries*, MDHI responds that "Ms. LeeVan's conclusory, self-serving statement does not create an issue of fact in the face of specific, undisputed evidence of delay caused by Boeing and other suppliers that was not factored into her analysis." *United States v. Sierra Pac. Indus.*, 879 F. Supp. 2d 1128, 1137 (E.D. Cal. 2012) (expert's "conclusory" and "self-serving" declaration, in which expert did "not provide any basis for his alleged personal knowledge" was insufficient to overcome summary judgment). Not only is the evidence of delay to which MDHI refers clearly "disputed," but, unlike the expert's declaration at issue in *Sierra Pacific Industries*, Ms. LeeVan's statement concerned the expert report which she authored and the methodology behind that report—matters undeniably within her personal knowledge. *See Rodriguez v. Airborne Express,* 265 F.3d 890, 902 (9th Cir. 2001) ("This circuit has held that self-serving affidavits are cognizable to establish a genuine issue of material fact so long as they state facts based on personal knowledge and are not too conclusory."). Nor does Ms. LeeVan's statement prove too conclusory, as she specifically notes why she rejected other causes of delay. Accordingly, the Court finds that there is a genuine dispute of material fact as to whether Boeing accounted for other sources of damages.

In arguing that Boeing failed to apportion its damages, MDHI states that the

---

[22] Boeing repeatedly asserts that its delay damages claim is based only on MDHI's late delivery of Airframe 24, and the fact that MDHI delivered Airframe 24 without critical assembles. (Doc. 138 at 14 ¶ 28).

"evidence indisputably shows that Boeing and other suppliers are at least partly responsible for Boeing's delivery delays," thus making Boeing's $6.2 million damages claim "fatally uncertain and speculative." (Doc. 142 at 6). In support, MDHI refers to what it calls "undisputed evidence" which allegedly "demonstrates that Boeing's production process was consumed with problems created by Boeing and suppliers other than MDHI from the beginning to the very end of the AH-6i program[.]" (Doc. 146 at 6–7 (citing Doc. 147 at 8–9, 13–19 ¶¶ 21–22, 37–55, 57)); *see also* Doc. 147 at 11 ¶ 28). MDHI also points out that, "[b]y the end of the program, Boeing attributed 6,795 rework hours to itself and other suppliers, more than four times the rework hours it ascribed to MDHI." (*Id.* at 6 (citing Doc. 147 at 13 ¶ 35)).

Although MDHI claims that this evidence is "undisputed," Boeing actually disputes each and every "fact" on which MDHI relies as support for its failure to apportion argument, or else clarifies why MDHI's statements are incomplete and therefore misleading. *Compare* (Doc. 147 at 8–9, 11, 13–19 ¶¶ 21–22, 28, 37–55, 57), *with* (Doc. 138 at 10–12, 14, 16–26 ¶¶ 21–22, 28, 37–55, 57). Moreover, while MDHI believes it to be significant that Boeing attributed to itself more than four times the rework hours it attributed to MDHI, (Doc. 146 at 6, 11 (citing Doc. 147 at 12–13 ¶¶ 34–35)), "Boeing disputes that comparing rework hours attributed to Boeing versus rework hours attributed to MDHI is relevant to Boeing's delay claim[,]" (Doc. 138 at 16 ¶¶ 34–35). Rather, Boeing states that its "rework hours reflected in the cited data include *all* issues identified on Boeing's production line, whereas those attributable to MDHI include only those identified *after delivery*—omitting all those non-conformances that MDHI would have identified *on its production line* that Boeing may or may not have been notified of." (*Id.*). Accordingly, Boeing counters that MDHI's "factual challenges" to Boeing's damages calculations are actually based on disputed facts" and, therefore, inappropriate for resolution through summary judgment. (Doc. 137 at 13). The Court agrees. To the extent that MDHI claims that Boeing's own conduct, or that of a third party, contributed to Boeing's damages, MDHI is free to challenge Boeing's damage calculations at trial. *See Pfizer Inc. v.*

*Advanced Monobloc Corp.*, No. 97C-04-037-WTQ, 1999 WL 743927, at *12 (Del. Super. Ct. Sept. 2, 1999) (recognizing that "apportionment" is synonymous with "proximate cause," and stating that "[u]nless the evidence is undisputed and the inferences are plain and not subject to reasonable doubt, the question of proximate cause is for the trier of fact.").

Under Delaware law, Boeing "must prove [its] damages with a reasonable degree of precision and cannot recover damages that are 'merely speculative or conjectural.'" *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004) (quoting *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964)). However, Boeing is "not required to establish a specific dollar amount of damages" to survive summary judgment. *In re Cencom Cable Income Partners*, No. 14634, 1997 WL 666970, at *12 (Del. Ch. Oct. 15, 1997). Rather, Boeing "need only present some credible evidence, though disputed, that supports a claim for damages." *Id.* Boeing claims it has "done just that in the expert report of Cheryl LeeVan, who relies on admissible evidence and testimony to calculate Boeing's damages in this case." (Doc. 137 at 13). According to Boeing, Ms. LeeVan's report "discusses in detail the 'credible evidence' of damages on which she relies, and the jury would be entitled to rely on her testimony to issue a substantial damages award" in Boeing's favor. (*Id.*).

Boeing's $3,791,421 delay claim is based on MDHI's alleged failure to deliver all 24 fuselages in accordance with the contractual delivery dates, and the additional work scope required by Boeing as a result of this delay. (Doc. 127-8 at 33–34). Boeing avers that timely and regular delivery of the airframes was critical to the assembly process because the airframe was the starting point from which Boeing would build the aircraft. (Doc. 138 at 3–4 ¶ 1). According to Ms. LeeVan, "[a]s a result of MDHI's delay in delivering airframes as well as its failure to complete the required work scope on aircraft 24, Boeing had to maintain program support staff for an additional eight months longer than planned." (Doc. 127-8 at 35). "The continuing AH-6i program staff would have otherwise transferred to work on other Boeing programs." (*Id.* at 35–36). Therefore, in her report, Ms. LeeVan "quantified the cost to Boeing of extending the AH-6i program schedule eight months from

August 2017 through March 2018[,]" and determined that this resulted in $3,791,421 in performance extension costs. (*Id.* at 36).

Ms. LeeVan also discusses in her report the basis for Boeing's $799,456 cumulative disruption claim, stating that "Boeing's AH-6i production line experienced cumulative disruption as a result of MDHI's failure to deliver airframes 8 and forward on schedule or even commit to a defined delivery schedule." (Doc. 127-8 at 31). "This disruption manifested in (i) inability to plan due to uncertainty in future deliveries; (ii) having airframes arrive in bunches and not in a cadenced fashion; (iii) inability to takt as planned; (iv) laying off workforce or moving workers to other programs; (v) re-hiring and re-training workforce; and (vi) not having other MDHI supplied parts available for assembly." (*Id.*). Ms. LeeVan determined the impact of MDHI's failure to deliver airframes on schedule on Boeing's factory hours by analyzing "actual performance of the structural and final assembly work by aircraft compared to a learning curve." (*Id.*). After evaluating Boeing's actual productivity on aircrafts 13 through 22, Ms. LeeVan states that she "developed a learning curve based on actual performance of scheduled work for aircraft 13 to 22." (*Id.*). Then, Ms. LeeVan explains that she "plotted this learning curve to aircraft 8 through 24 to determine the expected number of scheduled work hours had Boeing achieved the learning curve beginning with aircraft 8. (*Id.* at 32). Based on this, Ms. LeeVan determined how many hours Boeing spent on scheduled work above the learning curve on aircrafts 8 through 24, and thereafter found that this excess number of hours cost Boeing almost $800,000. (Doc. 127-8 at 32).

While MDHI argues that Boeing's damages counterclaims are "uncertain and speculative," Boeing points out that Ms. LeeVan "establishes a direct causal link between MDHI's delay in delivering a short-shipped Airframe 24 and all of Boeing's claimed delay costs." (Doc. 137 at 14 (citing Doc. 138 at 14 ¶ 28)). Boeing further states that Ms. LeeVan also "establishes a direct causal link between the impact of MDHI's delays in its shipments of Airframes 2–24 on the 'learning curve' of Boeing's assembly line laborers and the cumulative disruption claim she derived from application of standard regression analysis

principles." (*Id.* (citing Doc. 138 at 24–25 ¶ 56)). Moreover, Boeing points out that the Defense Contract Audit Agency "states that disruption or loss or efficiency can be measured using 'should cost analysis compared to direct labor hours.'" (*Id.* at 15 (citing Doc. 138 at 25–26 ¶ 56)).

Boeing has set forth a model of damages sufficient to overcome a motion for summary judgment.[23] Although MDHI raises several factual challenges to Boeing's damage calculations, MDHI has not set forth a damages expert that rebuts Ms. LeeVan's model. For these reasons, the court finds that genuine issues of material fact remain regarding the appropriate measure of damages in this case. *See In re Reliance Sec. Litig.*, 135 F. Supp. 2d 480, 510 (D. Del. 2001); *Reiver v. Murdoch & Walsh, P.A.*, 625 F. Supp. 998, 1009 (D. Del. 1985) ("There remain a number of factual issues bearing on the measure of contract damages which this Court cannot resolve on a motion for summary judgment.").

In conclusion, the Court finds that Boeing has presented credible evidence of damages, and that MDHI's factual challenges to Boeing's damages calculations cannot be resolved at summary judgment. Accordingly, MDHI's Motion for Summary Judgment is denied as to Boeing's Third and Fifth Counterclaims.

## B. Boeing's Sixth Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Boeing's Sixth Counterclaim alleges that MDHI breached the implied covenant of good faith and fair dealing by:

> a. failing to issue joint, written notice to third parties stating that they can work with Boeing on the MELB and AH-6i helicopter lines; b. maliciously and unfairly influencing

---

[23] MDHI also contends that Boeing's damages claim lacks any basis in law or fact because: Boeing's "$3.8 million delay claim rests on the false premise that Boeing was unable to decrease its levels of support staffing during slow periods caused by delay;" and (ii) because Boeing's cumulative disruption claim is "based only on inadmissible conjecture by Boeing's damages expert." (Doc. 146 at 10). As the Court already finds that MDHI's factual challenges to Boeing's damages calculations cannot be resolved at summary judgment, the Court need not reach these arguments. As with the other factual challenges MDHI asserts, the appropriate level of staffing and the methodology behind Ms. LeeVan's report ultimately present factual disputes that should be resolved at trial.

Boeing's ability to obtain parts from other suppliers or distributors for the MELB and AH-6i helicopter lines; c. failing to deliver timely, conforming products to Boeing for the MELB and AH-6i helicopter lines; d. breaching its warranty obligations for the MELB and AH-6i helicopter lines; e. refusing to return parts to Boeing that Boeing owns or has a right to control and possess, thereby converting them; f. damaging Boeing's business reputation with its current and potential customers; and g. generally acting with an objective to undermine Boeing's efforts so that MDHI could promote its own MD540F helicopter over the AH-6i.

(Doc. 16 at 33–34 ¶¶ 148–50). The Court's Order ruling on MDHI's Motion to Dismiss determined that while this Sixth Counterclaim failed with regard to the AAA, Cross License, LTRC, and GP1, it survived with regard to the 2015 MOA. (Doc. 50 at 14).

Although MDHI asks that the Court grant summary judgment in its favor "on all claims and counterclaims," MDHI makes no argument as to why there is no genuine dispute of material fact regarding Boeing's Sixth Counterclaim for breach of the implied covenant of good faith and fair dealing beyond those which MDHI also makes as to Boeing's breach of contract counterclaims. Accordingly, the Court declines to grant summary judgment in MDHI's favor on Boeing's Sixth Counterclaim.

### C.  Boeing's Seventh Counterclaim for Conversion

Conversion is the "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Focal Point, Inc. v. U-Haul Co. of Arizona*, 746 P.2d 488, 489 (Ariz. Ct. App. 1986).[24] As "[c]onversion is an offense against possession of property[,]" the claimant must demonstrate "that at the time of the conversion he was in possession of the property or was entitled to the immediate possession thereof." *Empire Fire & Marine Ins. Co. v. First Nat. Bank of Arizona*, 546 P.2d 1166, 1168 (Ariz. Ct. App. 1976).

---

[24] Arizona law applies to Boeing's Seventh Counterclaim for conversion. (Doc. 50 at 14).

Boeing alleges that MDHI is unlawfully in possession of defective AH-6i parts returned to MDHI for repairs as well as other parts furnished by Boeing as contractor furnished equipment ("CFE") for installation by MDHI on the final airframe. (Doc. 16 at 34 ¶¶ 152–56). Specifically, Boeing alleges that MDHI has failed to return a hub assembly, several defective AH-6i parts, a defective AH-6i tail boom, and several pieces of CFE for the final airframe, including a left hand vertical frame, a base plate, and the closeout panel. (*Id.* at 22–23 ¶¶ 72–90). MDHI admitted that it is in possession of the tail boom, the left hand vertical frame, the base plate, and the closeout panel. (Doc. 57 at 11 ¶¶ 85, 88). According to Boeing, MDHI's intentional exercise of dominion and control over these parts (and failure to return them) has severely interfered with Boeing's ownership rights and its right of control and possession. (Doc. 16 at 34 ¶¶ 152–56).[25] As a result, Boeing asserts that it was damaged because it was forced to procure a commercial tail boom, perform modifications of this tail boom to fit the AH-6i aircraft, and incurred costs to certify the modified tail boom for use on the aircraft. (Doc. 127-8 at 27–28). Boing also claims that it incurred costs to replace parts that were sent to MDHI for repair under the warranty clause of GP1 but that MDHI has failed to return. (*Id.* at 28). Finally, Boeing asserts that it was forced to replace the left hand vertical frame, the right hand vertical frame, the base plate, and the closeout panel in order to complete Airframe 24, resulting in increased costs. (*Id.* at 28; *see also* Docs. 16 at 23 ¶¶ 88–90).

MDHI contends that Boeing's refusal to pay MDHI the "$3.8 million for meeting certain production milestones relieved MDHI of any obligation to deliver a few final parts for the avionics shelf of aircraft 24, and to repair and return certain warranty parts." (Doc. 142 at 11). According to MDHI, Boeing's failure to pay this $3.8 million constituted a "material breach," thereby relieving MDHI of its remaining contractual obligations.

---

[25] In its Answer, Boeing states that certain initial deliveries of the AH-6i from MDHI did not constitute final acceptance or "contractual delivery" because the parts were "incomplete and nonconforming." (Doc. 16 at 4 ¶ 29). Boeing made this statement to argue that certain payments were not due to MDHI. Accordingly, any AH-6i parts that were never "contractually delivered" and sent back to MDHI for repair were never owned by Boeing and thus would not qualify for a claim of conversion. (*See* Doc. 50 at 14 n.3).

(Doc. 146 at 16). Nevertheless, there is a genuine dispute of material fact as to whether Boeing's failure to pay the $3.8 million in invoices constitutes a material breach. Per Section 20 of the H900, Boeing had the right to extend the delivery payment terms in accordance with the length of any MDHI performance delays. (Doc. 138-2 at 5). Moreover, Article 12 of GP1 requires that MDHI continue its performance despite any dispute that arises under the contracts. (Doc. 127-1 at 46). For these reasons, the Court denies MDHI's Motion for Summary Judgment on Boeing's Seventh Counterclaim for conversion.

### D.    Boeing's Eighth Counterclaim for Tortious Interference with Contract and Business Expectancy

To prevail on its Eighth Counterclaim for tortious interference with contract and business expectancy under Arizona law, Boeing must prove: (1) "the existence of a valid contractual relationship or business expectancy"; (2) "the interferer's knowledge of the relationship or expectancy"; (3) "intentional interference inducing or causing a breach or termination of the relationship or expectancy"; and (4) "resultant damage to the party whose relationship or expectancy has been disrupted." *Miller v. Hehlen*, 104 P.3d 193, 202 (Ariz. Ct. App. 2005) (quoting *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 909 P.2d 486, 494 (Ariz. Ct. App. 1995)). The interference also "must be 'improper' before liability will attach." *Id.* (citing *Bar J Bar Cattle Co. v. Pace*, 763 P.2d 545, 547 (Ariz. Ct. App. 1988).[26]

MDHI argues that Boeing's Eighth Counterclaim fails because Boeing "has not identified any existing Boeing contracts or relationships that MDHI induced a third party to breach or terminate," nor any evidence that MDHI interfered with any of these contractual or business relationships. (Doc. 146 at 17). Nevertheless, Boeing clearly references its contractual relationship with the U.S. Army, who, in turn, contracted with the SANG for the sale of the 24 AH-6i helicopters which the Purchase Contract concerned. (Docs. 16 at 15 ¶ 38, 25 ¶ 103; 137 at 17; 138 at 35 ¶¶ 31–33; *see also* Doc. 144-3 at 2–26

---

[26] As noted in the Court's Order ruling on MDHI's Motion to Dismiss Boeing's counterclaims, Arizona law applies to Boeing's Eighth Counterclaim. (Doc. 50 at 15).

(evidence of Boeing's contract with the U.S. Army for the sale of the 24 AH-6i helicopters)). Not only does Boeing claim that MDHI repeatedly told the U.S. Government that Boeing did not have the right to build the AH-6i, but Boeing also asserts that MDHI "disparaged Boeing in direct communications with the government about the AH-6i program." (Doc. 138 at 35–36 ¶¶ 31–33). In support, Boeing cites an email chain from December 2016 where the Army's Assistant Product Director for the AH-6i alerted Boeing that "MDHI is claiming that the fuselage delays are Boeing['s] fault[.]" (Doc. 138-5 at 39).[27] Because "MDHI acted as a subcontractor for Boeing on the SANG contract," Boeing asserts that "there was no legitimate reason for MDHI to be communicating with the U.S. Government on that contract, making these communications particularly egregious." (Doc. 137 at 7).

Moreover, Boing claims that MDHI interfered with its business relationships with various suppliers and distributors. (*Id.* at 17). At a conference in early December of 2012, MDHI's CEO Lynn Tilton reportedly told MDHI's suppliers that there were "on-going legal issues between Boeing and [MDHI] over the manufacturing rights" of certain parts for Boeing's aircraft. (Doc. 138-4 at 70). While Ms. Tilton did confirm that Boeing has "rights to certain part numbers for the MELB program[,]" Ms. Tilton "could not provide a list of those part numbers that Boeing has the rights to." (*Id.*). At that same conference, MDHI's General Counsel also allegedly informed suppliers that they could not accept orders from Boeing for any parts over which MDHI claimed ownership. (*Id.*). Since Ms. Tilton and MDHI's General Counsel made these statements, Boeing claims that

---

[27] Although MDHI objects to this email chain as inadmissible hearsay, (Doc. 142 at 12), a non-movant's hearsay evidence may establish a genuine issue of material fact precluding the grant of summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). With respect to the non-movant's evidence offered in opposition to a motion for summary judgment, the Ninth Circuit has stated that the proper inquiry is not the admissibility of the evidence's form, but rather whether the contents of the evidence are admissible. *Fraser*, 342 F.3d at 1036; *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." (emphasis added)).

multiple suppliers have expressed concern with selling parts to Boeing in light of the contentious relationship between MDHI and Boeing. (Doc. 137 at 17). As Boeing points out, one supplier told Boeing in 2013 that the legal issues between MDHI and Boeing "put Prescott Aerospace in the middle of an issue that we should not have to deal with." (Doc. 138 at 35 ¶ 26 (citing Doc. 138-4 at 70)). According to Boeing, this supplier, Prescott Aerospace, was still refusing to sell Boeing parts as of late 2017 because "MD Helicopters has not given us authorization to sell their parts to Boeing." (*Id.* (citing Doc. 138-4 at 75)). Further, another supplier refused to quote AH-6i parts to Boeing under what Boeing states was "the erroneous belief that those parts belonged to MDHI," (*id.*), writing: "[i]t does not make sense for Kamatics to risk a million plus worth of MDHI business to save Boeing $10k a unit[,]" (Doc. 144-3 at 35–36). (*See also* Docs. 138-5 at 2–5; 144-3 at 39). Similarly, Airheart, a different supplier, was reluctant to discuss selling its parts to Boeing because they were following "the directive of MD[HI] that the suppliers should not talk with us at Boeing." (Doc. 138 at 35 ¶ 28 (citing Doc. 138-5 at 8–9)).

In its Reply, MDHI counters that this evidence cited by Boeing fails to support Boeing's interference claim because it merely establishes that there were "on-going legal issues between Boeing and [MDHI] over the manufacturing rights of certain [parts][.]" (Doc. 142 at 12 (citing Doc. 138-4 at 70)). According to MDHI, giving a third party "truthful information" to cause them not to perform a contract or enter into a prospective contractual relation does not subject that party to liability for tortious interference. (*Id.* (citing Restatement (Second) of Torts § 772 (1977))). MDHI also states that it is entitled to assert its proprietary rights to those suppliers without being liable for interference. (*Id.* (citing Restatement (Second) of Torts § 773 (1977) (no interference by "[o]ne who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another"))).

Even so, § 773 of the Restatement (Second) of Torts "protects the actor only when

(1) he has or honestly believes he has a legally protected interest, (2) which he in good faith asserts or threatens to protect, and (3) he threatens to protect it by proper means." *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 212–13 (Ariz. 1986) (citing *McReynolds v. Short*, 564 P.2d 389, 394 (Ariz. Ct. App. 1977)). Here, there appears to be a dispute as to whether MDHI asserted its legally protectable interests "in good faith" and threatened to protect that interest "by proper means" as MDHI warned suppliers not to accept orders from Boeing for any parts over which MDHI claimed ownership, but yet MDHI was unable to precisely confirm which parts it owned. (*See* Doc. 138-4 at 70 (letter from Prescott Aerospace reporting that MDHI's CEO and General Counsel "stated that while Boeing does have rights to certain part numbers for the MELB program," MDHI "could not provide a list of those part numbers that Boeing has the rights to")). As Boeing's evidence illustrates, these warnings from MDHI even deterred various suppliers from selling to Boeing parts which Boeing legally owned by engendering a directive that suppliers "should not talk" with Boeing at all for fear of repercussions from MDHI. (Doc. 138 at 35 ¶ 28). Thus, Boeing asserts that MDHI "wrongly told third-party suppliers of AH-6i parts that they [cannot] supply such parts to Boeing." (Doc. 137 at 2). Accordingly, the Court finds that Boeing has presented sufficient evidence to create a genuine dispute of material fact as to each of the first three elements required to prove tortious interference, in addition to the fifth element (i.e., whether MDHI acted improperly). *See Bar J Bar Cattle Co.*, 763 P.2d at 547; *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 211 (Ariz. 1986).

As to the fourth element of a claim for tortious interference, "resultant damage to the party whose relationship or expectancy has been disrupted," *Miller*, 104 P.3d at 202, Boeing acknowledged at oral argument that it has not yet presented any evidence of actual damages, but contends that it is entitled to nominal damages for MDHI's intentional tortious interference. Nominal damages are "a trivial sum of money awarded to a litigant who has established a cause of action but has not established that he is entitled to compensatory damages." Restatement (Second) of Torts § 907 (1979).

It is true that tortious interference is an intentional tort "in the sense that [MDHI]

must have intended to interfere with [] [Boeing's] contract or have known that this result was substantially certain to be produced by its conduct." *Snow*, 730 P.2d at 211 (citations omitted); *see Safeway Ins. Co. v. Guerrero*, 106 P.3d 1020, 1030 (Ariz. 2005) (referring to tortious interference with contractual relations as an "intentional tort"); *Dube v. Likins*, 167 P.3d 93, 100 (Ariz. Ct. App. 2007) (referring to tortious interference with business expectancy as an "intentional tort"); Restatement (Second) of Torts § 774A, cmt. a (noting that the tort of interference with contract or prospective contractual relation "is an intentional one"). "In a number of common law actions associated with intentional torts, the violation of the plaintiff's right has generally been regarded as a kind of legal damage in itself. The plaintiff who proves an intentional physical tort to the person or to property can always recover nominal damages." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1157 (9th Cir. 2016) (quoting 3 Dan B. Dobbs et al., *The Law of Torts* § 480 (2d ed. 2011)). Moreover, "[t]he tort need not be physical in order to recover nominal damages." *Id.*

Even so, nominal damages are only awarded in cases where "harm is not requisite to a cause of action." Restatement (Second) of Torts § 907 (1979). Comment a to section 907 explains that "[i]f actual damage is necessary to the cause of action, as in negligence, nominal damages are not awarded."[28] Significantly, actual damages *are* an essential element of a cause of action for intentional interference. *See Miller*, 104 P.3d at 202 ("To establish a prima facie claim for tortious interference with contract, a plaintiff must show . . . resultant damage to the party whose relationship or expectancy has been disrupted.") (internal quotations omitted); *Chanay v. Chittenden*, 563 P.2d 287, 291 (Ariz. 1977) (noting that the claimant must have sustained "actual damages" as a result of the tortious interference). Therefore, Boeing may not seek nominal damages here.

MDHI claims that it is entitled to summary judgment on Boeing's counterclaim for tortious interference because "Boeing has failed to provide, through its expert witness or otherwise, any calculation or evidence of damages suffered as a result of MDHI's

---

[28] *See Dixon v. City of Phoenix*, 845 P.2d 1107, 1116 (Ariz. Ct. App. 1992) ("Arizona courts generally follow the Restatement in the absence of controlling Arizona authority.").

purported tortious interference." (Doc. 146 at 17). In its Statement of Facts, Boeing points to Ms. LeeVan's expert report, which details the more than $6 million in damages allegedly suffered by Boeing as a result of MDHI's "many performance failures and torts." (Doc. 138 at 36 ¶ 34). As to Boeing's tortious interference counterclaim in particular, however, Ms. LeeVan merely states that "MDHI's continuing interference with Boeing's supply chain has led to the need for Boeing to perform unexpected planning and increased coordination activities with Boeing's supply base." (Doc. 127-8 at 38). Ms. LeeVan also notes that she "expect[s] to analyze any increased costs as additional information becomes available." (*Id.*).

Ms. LeeVan's mere "conjecture or speculation will not suffice." *Andrew Brown Co. v. Painters Warehouse, Inc.*, 531 P.2d 527, 531 (Ariz. 1975). "[D]amages which result from a tort must be established with reasonable certainty." *McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996) (quoting *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993), *abrogated on other grounds by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016)); *see also Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F. Supp. 2d 1118, 1128 (D. Ariz. 2008) ("To prevail on its tortious interference claim, [claimant] must establish its damages with 'reasonable certainty.'") (citing *S. Union Co. v. Sw. Gas Corp.*, 180 F. Supp. 2d 1021, 1050 (D. Ariz. 2002)). "Damages that are speculative, remote or uncertain may not form the basis of a judgment." *Soilworks, LLC*, 575 F. Supp. 2d at 1128 (quoting *Coury Bros. Ranches v. Ellsworth*, 446 P.2d 458, 464 (Ariz. 1968)). Rather, a "reasonable basis of computation" must exist to award damages. *Soilworks, LLC*, 575 F. Supp. 2d at 1128 (citing *Eastman Kodak Co. of New York v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927)).

Not only does Ms. LeeVan not suggest an amount of damages attributable to MDHI's alleged tortious interference, but she fails to provide any calculations or evidence supporting her statement that "MDHI's continuing interference with Boeing's supply chain has led to the need for Boeing to perform unexpected planning and increased coordination activities with Boeing's supply base." (Doc. 127-8 at 38). For these reasons, Boeing's

evidence falls short of meeting the reasonable certainty standard. *See Soilworks, LLC*, 575 F. Supp. 2d at 1128 (granting summary judgment in favor of defendant on plaintiff's tortious interference claim because plaintiff was unable to establish its damages with reasonable certainty where plaintiff not only was "unable to articulate any facts" regarding the bids or sales allegedly lost as a result of the defendant's conduct, but also unable "to estimate the amount of damages allegedly caused"). The Court accordingly will grant summary judgment in favor of MDHI on Boeing's Eighth Counterclaim for tortious interference with contract and business expectancy.

### E.     Boeing's Ninth Counterclaim for Declaratory Judgment

In its Ninth Counterclaim, Boeing seeks declaratory judgment pursuant to 28 U.S.C § 2201 and A.R.S. § 12-1831 *et seq.* as to the following:

> a.     The AH-6i is a MELB Aircraft as defined in the Cross License, and MDHI must cease any representations or conduct that suggests otherwise;
> b.     Because the AH-6i is a MELB Aircraft, it is in Boeing's exclusive Field of Use under the Cross License and outside of MDHI's Field of Use;
> c.     Because the AH-6i is in Boeing's exclusive Field of Use under the Cross License, MDHI is prohibited from supporting or servicing it (or competing with Boeing to do so) without Boeing's permission;
> d.     MDHI has a contractual duty to issue joint, written notices to third parties making clear that that they can work with Boeing on the AH-6i helicopter line;
> e.     MDHI has a contractual duty to abstain from any actions that impede Boeing's ability to obtain parts from other suppliers or distributors for the AH-6i line;
> f.     Boeing owns all of the rights to manufacture MELB Aircraft under the AAA and Cross License;
> g.     Boeing had the contractual right to modify the payment terms under H900 as a result of MDHI's delays; and
> h.     Boeing has the contractual right to offset its costs resulting from MDHI's delay and disruption to the AH-6i program against any outstanding invoices of MDHI.

(Doc. 16 at 35–36 ¶¶ 163–65).

The Declaratory Judgment Act, 28 U.S.C § 2201, confers "on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995); *see also Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223 (9th Cir. 1998) ("The [Declaratory Judgment] Act 'gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.'") (quoting *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962)). "On its face, the statute provides that a court '*may* declare the rights and other legal relations of any interested party seeking such declaration.'" *Wilton*, 515 U.S. at 286 (citing 28 U.S.C § 2201(a) (emphasis added)).

The Court observes that parts "a" through "f" of Boeing's Ninth Counterclaim relate to issues covered by the alternative dispute resolution provisions of the Asset Acquisition Agreement ("AAA") and Cross License and, thus, are no longer at issue in this litigation. (*See* Doc. 50 at 7–10).[29] As to parts "g" and "h" of Boeing's Ninth Counterclaim, however, MDHI makes no argument explaining why it is entitled to summary judgment. Part "h"— which seeks a declaratory judgment that "Boeing has the contractual right to offset its costs resulting from MDHI's delay and disruption to the AH-6i program against any outstanding invoices of MDHI"—appears that it would necessarily be addressed by adjudication of the existing claims; however, it is unclear whether part "g"—which seeks a declaratory judgment that "Boeing had the contractual right to modify the payment terms under H900 as a result of MDHI's delays"—would be.

Currently, there is a split among district courts in the Ninth Circuit as to how to handle counterclaims for declaratory relief which are repetitious of issues already before

---

[29] In its April 23, 2018 Order, the Court dismissed Boeing's First, Second, and Fourth counterclaims for breach of the AAA, breach of the cross license, and breach of GP1, respectively. (Doc. 50 at 7–10, 17). However, in that Order, the Court exercised its discretion and chose not to dismiss Boeing's Ninth Counterclaim, either in whole or in part. (*See id.* at 16–17 (citing *Wilton*, 515 U.S. at 288; *Gov't Emps. Ins. Co.*, 133 F.3d at 1223 ("The [Declaratory Judgment] Act 'gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.'")). Although it is clear that parts "a" through "f" of Boeing's Ninth Counterclaim are no longer at issue in this litigation given they only relate to claims that the Court previously dismissed, (Doc. 50 at 7–10, 17), the Court will, again, exercise its discretion under the Declaratory Judgment Act and choose not to dismiss parts "a" through "f" because parts "g" and "h" remain viable.

the court via the complaint or affirmative defenses. *See Sw. Windpower, Inc. v. Imperial Elec., Inc.*, No. CV-10-8200-SMM, 2011 WL 486089, at *3 (D. Ariz. Feb. 4, 2011) (citing cases that dismiss such counterclaims and dismissing the defendant's counterclaims for declaratory judgment as "repetitious of issues already before the [C]ourt via the complaint . . . that will necessarily be disposed of by [the plaintiff's] claims") (internal quotations omitted); *see also Aviva USA Corp. v. Vazirani*, 902 F. Supp. 2d 1246, 1272–73 (D. Ariz. 2012), *aff'd*, 632 F. App'x 885 (9th Cir. 2015) (dismissing the defendants' counterclaims for declaratory judgment upon the plaintiff's motion for summary judgment where the defendants failed to show the necessity of declaratory judgment on their counterclaims and where the court determined that these counterclaims would be rendered moot by the adjudication of the main action); 6 Charles Alan Wright, et al., *Federal Practice & Procedure* § 1406 (3d ed. 2019) (discussing the split among courts and citing cases). Some courts have concluded that Federal Rule of Civil Procedure 41(a) "contains sufficient protection for [the] defendant against [the] plaintiff's withdrawal and therefore a counterclaim for a declaratory judgment involving the same transaction as [the] plaintiff's claim is wholly redundant and does not serve any useful purpose." 6 Charles Alan Wright, et al., *Federal Practice & Procedure* § 1406 (3d ed. 2019). However, this conclusion has not been widely accepted because it "ignores the possibility that it is very difficult to determine whether the declaratory judgment counterclaim really is redundant prior to trial." *Id.*

Here, the Court will follow the "safer course" by choosing not to dismiss Boeing's Ninth Counterclaim for declaratory judgment as the Court is unable to say that "there is no doubt" that part "g" of this counterclaim "will be rendered moot by the adjudication of the main action." *Id.*

## V.     CONCLUSION

//

//

//

For the reasons set forth above,

**IT IS ORDERED** that Boeing's Motion for Partial Summary Judgment on MDHI's *Force Majeure* Defense (Doc. 123) is **GRANTED** to the extent that MDHI will not be permitted to assert Article 13 of GP1's *force majeure* excuse in connection with its claims or defenses in this case.

**IT IS FURTHER ORDERED** that MDHI's Motion for Summary Judgment (Doc. 146) is **GRANTED IN PART** and **DENIED IN PART**.

MDHI's Motion for Summary Judgment is **GRANTED** as to Boeing's Eighth Counterclaim for tortious interference with contract and business expectancy.

MDHI's Motion is **DENIED** as to: (a) MDHI's breach of contract claim; (b) MDHI's claim for breach of the implied covenant of good faith and fair dealing; (c) parts "b" and "c" of Boeing's Third Counterclaim for breach of the LTRC; (d) Boeing's Fifth Counterclaim for breach of the 2015 MOA and PCC-32; (e) Boeing's Sixth Counterclaim for breach of the implied covenant of good faith and fair dealing; (f) Boeing's Seventh Counterclaim for conversion; and (g) Boeing's Ninth Counterclaim for declaratory judgment.

The Clerk of the Court shall not enter judgment at this time.

Dated this 15th day of August, 2019.

James A. Teilborg
Senior United States District Judge